UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JARIUS J. BROWN,

        Plaintiff,

        v.                              Case No. 20-C-423

DR. PHILLIP WHEATLEY,
DR. BRIAN GROGAN, and
DR. GEOFFREY BAER,

        Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

Plaintiff Jarius J. Brown is currently a prisoner serving a sentence at Oshkosh Correctional Institution. He filed this *pro se* 42 U.S.C § 1983 action against Defendants Dr. Phillip Wheatley, Dr. Brian Grogan, and Dr. Geoffrey Baer, alleging that Defendants violated his constitutional rights. In particular, Plaintiff alleges that Defendants were deliberately indifferent to his medical needs by delaying his knee replacement surgery. This matter comes before the Court on Defendants' motions for summary judgment. For the following reasons, Defendants' motions will be granted, and the case will be dismissed with prejudice.

## BACKGROUND

Plaintiff Jarius Brown is an inmate who is currently, and at all relevant times was, housed at Oshkosh Correctional Institution. Pl.'s Proposed Findings of Fact ¶ 1, Dkt. No. 63. Since 2017, Plaintiff has seen multiple medical professionals, including Dr. Wheatley, to address the pain in his right knee. Wheatley Proposed Findings of Fact (WPFOF) ¶ 5, Dkt. No. 57.

Dr. Phillip Wheatley is a medical doctor licensed to practice in the state of Wisconsin and specializes in internal medicine. *Id.* ¶¶ 1, 3. Since 2014, Dr. Wheatley has been employed by the State of Wisconsin Department of Corrections and, at all relevant times, has worked for the Oshkosh Correctional Institution. *Id.* ¶ 2. In his role, Dr. Wheatley is not authorized to perform orthopedic surgeries and cannot direct another healthcare provider to perform a surgical procedure. *Id.* ¶ 14.

Since September 1, 2018, Dr. Brian Grogan has been an Assistant Professor in the Department of Orthopedics and Rehabilitation at the University of Wisconsin School of Medicine and Public Health (UW). Defs.' Proposed Findings of Fact (DPFOF) ¶ 2, Dkt. No. 48. At UW, Dr. Grogan specializes in shoulder, elbow, and sports medicine orthopedic surgery and supervises resident physicians. *Id.* ¶ 3. Dr. Geoffrey Baer has been an Associate Professor in the Department of Orthopedics and Rehabilitation at UW since August 2007. *Id.* ¶ 4. At UW, Dr. Baer specializes in sports medicine orthopedic surgery and also supervises resident physicians. *Id.* ¶ 5. Dr. Grogan and Dr. Baer do not perform total knee replacement surgeries. *Id.* ¶ 6. Dr. Grogan and Dr. Baer do not practice in the secure clinic for prisoners at UW, but they do review and sign off on residents' notes from prisoner patient visits at the secure clinic. *Id.* ¶¶ 7–8. Dr. Grogan and Dr. Baer are qualified to review and edit the residents' notes as needed and will clarify and change a treatment plan if they disagree with the proposed plan. *Id.* ¶ 11. Neither Dr. Grogan nor Dr. Baer have ever personally seen or evaluated Plaintiff, but they have edited and signed off on residents' notes concerning Plaintiff's treatment plan. *Id.* ¶ 13.

In 2017, Plaintiff met with Dr. Wheatley on multiple occasions for treatment for various issues, including pain and instability in his right knee. WPFOF ¶ 6. On January 12, 2018, Plaintiff saw Dr. Wheatley and complained that his knee pain was gradually worsening. *Id.* ¶ 7. Based on

2

his physical assessment of Plaintiff, a review of Plaintiff's medical records, and Plaintiff's reported symptoms, Dr. Wheatley referred Plaintiff to an outside provider specializing in orthopedic medicine, Dr. Eric Nelson. *Id.* ¶¶ 8–9. On February 8, 2018, Dr. Nelson evaluated Plaintiff at Waupun Memorial Hospital and discussed the possibility of undergoing a distal femoral osteotomy procedure, which involves a reshaping of the femoral bone to correct knee alignment. *Id.* ¶¶ 10–11. Dr. Nelson advised that a distal femoral osteotomy was "outside of his comfort zone" and referred Plaintiff to an orthopedic specialist at UW who might be willing to perform the surgery. *Id.* ¶¶ 12–13.

Dr. Wheatley saw Plaintiff again on April 10, 2018. *Id.* ¶ 20. Dr. Wheatley noted that, while Dr. Nelson believed an arthroscopy procedure "would be of no benefit," Dr. Nelson did refer Plaintiff to UW for another orthopedic evaluation. *Id.* ¶ 22. On August 2, 2018, Plaintiff had another appointment with Dr. Wheatley regarding Plaintiff's knee pain and instability, and Dr. Wheatley noted that Plaintiff would be evaluated at UW the following month. *Id.* ¶ 23.

On September 11, 2018, resident physician Dr. Joseph Mitchell evaluated Plaintiff at UW. DPFOF ¶ 16. Dr. Mitchell noted Plaintiff's chronic right knee pain, that Plaintiff had undergone two prior knee arthroscopies for his osteoarthritis, and that Plaintiff's treatment included acetaminophen and activity modification. *Id.* Dr. Mitchell determined that Plaintiff was not an ideal candidate for the distal femoral osteotomy because Plaintiff's osteoarthritis was in multiple compartments of the knee and Plaintiff would likely have pain after the surgery. *Id.* ¶ 19. Dr. Mitchell noted that Plaintiff had not maximized conservative measures and recommended anti-inflammatory medication and a knee brace. *Id.* ¶ 20. Plaintiff was given a steroid injection. *Id.* Dr. Baer agreed that, given Plaintiff's age, the degenerative changes in various knee compartments, and his history of two prior arthroscopies, proceeding with a steroid injection and an unloading

3

knee brace was the appropriate option at the time. *Id.* ¶ 24. Plaintiff was told to return for a follow-up in six months, in March 2019. WPFOF ¶ 26.

At a September 13, 2018, appointment with Plaintiff, Dr. Wheatley noted that Dr. Mitchell believed Plaintiff was not an ideal candidate for surgery because the surgery could accelerate degenerative changes in the left knee. *Id.* ¶¶ 28–29. Dr. Wheatley continued to see Plaintiff sporadically over the next several months for various reasons, including an appointment on December 18, 2018, where Dr. Wheatley noted that Plaintiff expressed relief from his September steroid injection. *Id.* ¶¶ 31–32. Dr. Wheatley referred Plaintiff to a physical therapist, provided Plaintiff with a knee brace, and assigned Plaintiff to a lower bunk. *Id.* ¶ 33.

On March 14, 2019, Plaintiff had a follow-up appointment with resident physician Dr. Rahul Samtani. DPFOF ¶ 25. Dr. Samtani noted that the first steroid injection provided relief for three to four months, and he ordered x-rays of Plaintiff's right knee. *Id.* ¶¶ 26, 28. The x-ray revealed osteoarthritis in all three knee compartments, with moderate to severe lateral compartment joint space loss that had progressed from Plaintiff's last x-ray. *Id.* ¶ 28. Dr. Samtani discussed treatment options with Plaintiff and noted that Plaintiff was quite young for a total knee replacement. *Id.* ¶ 29. Dr. Samtani also noted that, due to Plaintiff's osteoarthritis, a unilateral knee surgery should not be considered, and a tibial or femoral osteotomy would not be beneficial to Plaintiff. WPFOF ¶ 35. Dr. Samtani provided another steroid injection for pain relief, recommended anti-inflammatory medication, and directed Plaintiff to follow-up as needed or if his symptoms worsened. DPFOF ¶ 30. Dr. Grogan reviewed Plaintiff's chart and Dr. Samtani's notes and signed off on the treatment recommendations. *Id.* ¶ 35. Dr. Grogan has seen many patients who responded well to conservative treatments and wanted to pursue this treatment plan

until the treatments were no longer feasible. *Id.* ¶ 31. Dr. Grogan had no further involvement in Plaintiff's case after March 14, 2019. *Id.* ¶ 36.

On June 6, 2019, Plaintiff saw Dr. Wheatley for his knee pain, explaining that the March steroid injection offered less relief than the September injection. WPFOF ¶ 37. Dr. Wheatley referred Plaintiff to another orthopedic specialist, noting that while Plaintiff was quite young for a total knee replacement, it appeared to be "the only effective treatment." *Id.* ¶ 38.

On July 25, 2019, Plaintiff was seen at UW by an orthopedic fellow, Dr. Craig Chike Akoh. DPFOF ¶ 37. Plaintiff reported he was not getting relief from the anti-inflammatory medication or his knee brace and that the relief period from his steroid injections was becoming shorter. *Id.* ¶ 38. Dr. Akoh performed a physical exam, reviewed Plaintiff's previous x-rays, and noted progression in Plaintiff's osteoarthritis in all compartments of the right knee. *Id.* ¶¶ 39–40. Dr. Akoh discussed treatment options and risks of surgery with Plaintiff, explaining that he was quite young for a total knee replacement. *Id.* ¶ 41. Dr. Akoh gave Plaintiff another steroid injection and advised him to return in three to six months as needed for a follow-up. *Id.* ¶ 42. Dr. Baer reviewed and agreed with Dr. Akoh's findings and treatment recommendations. *Id.* ¶ 43.

On August 6, 2019, Plaintiff complained to Dr. Wheatley about severe knee pain, and Dr. Wheatley referred Plaintiff to UW for another evaluation. WPFOF ¶ 42. Dr. Wheatley continued to provide treatment to help minimize Plaintiff's pain and referred Plaintiff for additional physical therapy. *Id.* ¶ 43.

On October 10, 2019, Plaintiff returned to UW for an appointment with resident physician Dr. Justin Greiner. DPFOF ¶ 44. Dr. Greiner noted that the conservative measures to deal with the knee pain had been exhausted and the next step would be a total knee replacement surgery evaluation. *Id.* ¶ 47. Dr. Baer agreed with Dr. Greiner's findings since it appeared the pain

Plaintiff was experiencing was persistent and interfered with his daily activities and that Plaintiff was no longer getting relief from other treatment options. *Id.* On October 17, 2019, Dr. Wheatley noted that orthopedic specialists had recommended an evaluation for knee replacement and that a call had been placed to UW to schedule the appointment. WPFOF ¶¶ 45–46. Dr. Wheatley continued to see Plaintiff periodically to provide him with treatment to manage his knee pain. *Id.* ¶ 47.

On March 13, 2020, Plaintiff was evaluated for surgery at UW by Dr. Scott Anderson. DPFOF ¶ 48. Based on Plaintiff's age, recreation activity, and incarcerated status, Dr. Anderson believed he was not an ideal candidate for surgery and strongly recommended against total knee replacement surgery. WPFOF ¶ 50. Dr. Anderson offered Plaintiff another steroid injection, which Plaintiff denied. *Id.*

Plaintiff continued to meet with Dr. Wheatley who, on June 16, 2020, noted that UW had declined to perform any surgery and decided to try to obtain a second opinion concerning knee surgery by referring Plaintiff to Dr. Nelson. *Id*. ¶ 53. Through referrals and continued care and treatment, Dr. Wheatley did what was within his expertise as an internal medicine physician. *Id.* ¶ 56. Dr. Wheatley does not have the authority to force an orthopedic specialist to render any specific treatment if that specialist does not believe the treatment is indicated or appropriate. *Id.* ¶ 54. Plaintiff has now been approved for a surgical procedure by an orthopedic specialist, and Dr. Wheatley sent the prison a request to schedule the appointment. *Id.* ¶¶ 57–58.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence

6

Case 2:20-cv-00423-WCG   Filed 07/19/21   Page 6 of 11   Document 72

and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Dr. Wheatley

Plaintiff alleges that Dr. Wheatley was deliberately indifferent when he delayed his knee replacement surgery. The Eighth Amendment guarantees a prisoner's access to adequate food, clothing, shelter, and medical care by prohibiting "cruel and unusual punishments." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official violates the Eighth Amendment when he or she displays "deliberate indifference" to a prisoner's medical need or to a substantial risk of serious harm. *Id.* at 828. However, not every claim alleging a deprivation of adequate medical treatment translates into a violation of the Eighth Amendment. *Id.* at 834. A plaintiff asserting a claim of deliberate indifference must establish two elements: "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Deliberate indifference is more than mere negligence, as the prison official needs to act with a culpable state of mind. *Id.* at 751.

7

Dr. Wheatley agrees that Plaintiff suffered a serious medical need, but Plaintiff has not established the essential element of Dr. Wheatley's culpable state of mind. Deliberate indifference requires that the defendant "know of and disregard an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Deliberate indifference can be inferred when a defendant knows of a substantial risk and does nothing, or when he knowingly takes ineffectual actions. *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016).

Dr. Wheatley treated Plaintiff for approximately three years and recommended many conservative measures within his expertise to provide treatment and to relieve Plaintiff's knee pain. Dr. Wheatley's suggested treatments were appropriate and did not depart from accepted medical standards, given Plaintiff's symptoms. *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996) ("[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."). Dr. Wheatley's treatments included providing three referrals to orthopedic specialists and two referrals to physical therapy, moving Plaintiff to a bottom bunk, recommending that Plaintiff modify his recreational activity, and recommending use of a knee brace, ice, and anti-inflammatory medication. After two years, when a UW orthopedic specialist declined to perform surgery, Dr. Wheatley tried to find a second opinion for Plaintiff. This type of continuous treatment and advocacy for Plaintiff by Dr. Wheatley is not deliberate indifference.

Plaintiff claims that Dr. Wheatley delayed his knee replacement by not recommending surgery early on in his treatment plan. While delays in treating painful, non-life-threatening medical conditions can amount to deliberate indifference, small, isolated occurrences are not

enough compared to total treatment. *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). Dr. Wheatley consistently met with Plaintiff and attempted to manage his pain to the best of his abilities. Any delay was caused by concerns raised by offsite providers. Dr. Wheatley is not able to perform, recommend, or deny knee replacement surgery, as it is not within his expertise. Dr. Wheatley had no control over the timing and approval of Plaintiff's knee replacement surgery and therefore was not responsible for any delays. No jury could reasonably conclude that a delay in obtaining surgery was the result of Dr. Wheatley's deliberate indifference to Plaintiff's knee pain.

Although Plaintiff disagreed with the medical treatments Dr. Wheatley offered him, it is well settled that "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Dr. Wheatley's decision to treat Plaintiff in a certain way does not amount to deliberate indifference unless the chosen treatment plan departs from accepted medical standards. *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Again, Dr. Wheatley's conservative treatment options were consistent with accepted medical practice. Plaintiff has failed to show how these measures demonstrate Dr. Wheatley's deliberate indifference. Therefore, Dr. Wheatley's motion for summary judgment is granted.

### B. Dr. Grogan and Dr. Baer

Plaintiff also alleges that Dr. Grogan and Dr. Baer were deliberately indifferent to his medical needs. Drs. Grogan and Baer assert that they are not personally liable for any alleged constitutional violation because they never personally evaluated or treated Plaintiff. Liability for a § 1983 action can only attach to a defendant who personally caused or participated in the constitutional deprivation. *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). A supervising

9

official can be held personally responsible for a constitutional deprivation if the deprivation happens at the supervisor's direction or with his knowledge or consent. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Although Dr. Grogan and Dr. Baer never personally evaluated or examined Plaintiff during his visits to UW, as supervisors to the resident physicians who personally evaluated Plaintiff, Dr. Grogan and Dr. Baer reviewed and signed off on the resident physicians' treatment plans. As a result, Dr. Grogan and Dr. Baer were personally involved with Plaintiff's care.

In any event, Dr. Grogan and Dr. Baer were not deliberately indifferent to Plaintiff's medical needs. Plaintiff was evaluated at UW four times, and Dr. Baer reviewed and signed off on three of those visits. Dr. Grogan signed off on Plaintiff's treatment plan once, after Plaintiff's second referral to UW. Dr. Grogan had seen many patients succeed with conservative treatments, including patients with severe osteoarthritis in various compartments of the knee, like Plaintiff's condition. Dr. Grogan and Dr. Baer knew that it is standard practice to treat knee pain with conservative treatments before considering surgery because of the risks involved, and they wanted to determine whether these treatments benefited Plaintiff. After each evaluation, the resident physicians suggested treatment options and explained the potential benefits and risks to Plaintiff. Plaintiff approved and attempted some of these treatments and provided feedback on the effectiveness of each treatment. Plaintiff indicated he received some benefit from the conservative treatments at two of his three follow-up appointments. During his final referral visit at UW with Dr. Greiner, Plaintiff reported that he was no longer benefitting from the conservative treatments, so Dr. Greiner recommended a surgical evaluation and Dr. Baer agreed.

The UW physicians continually evaluated and updated the treatment plan and attempted different conservative methods until Plaintiff no longer experienced relief. The ongoing

10

assessments of Plaintiff's experiences with the treatments show that Drs. Grogan and Baer were attempting to manage Plaintiff's pain to the best of their abilities. Drs. Grogan and Baer made good faith efforts to appropriately treat Plaintiff, and they had no reason to believe the treatments were ineffective until Plaintiff indicated he was no longer experiencing relief. Once the conservative treatments were exhausted, Plaintiff was referred to Dr. Anderson for a surgical evaluation. The recommendations made by the resident physicians and approved by Drs. Grogan and Baer were standard medical practice for a patient with Plaintiff's symptoms and medical history, and the physicians did not significantly deviate from accepted practices according to their area of expertise. *See Pyles*, 771 F.3d at 409 ("The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment."). Again, Plaintiff's disagreement with the treatment plans is not enough to constitute deliberate indifference. *Id.* No reasonable jury could conclude that Drs. Grogan and Baer's attentive assessments amounted to deliberate indifference. Therefore, the motion for summary judgment is granted.

## CONCLUSION

For these reasons, the Defendants' motions for summary judgment (Dkt. Nos. 46 & 53) are **GRANTED**. Having found no constitutional violation, the Court need not address Defendants' qualified immunity arguments. The clerk is directed to enter judgment dismissing this case with prejudice.

**SO ORDERED** at Green Bay, Wisconsin this 19th day of July, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge